1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

| | |
|---|---|
| The OFFICE CANTONAL DES FAILLITES DE LA RÉPUBLIQUE ET DU CANTON DE GENÈVE, acting in its capacity as representative in the bankruptcy of AMOMA SARL, a Swiss limited liability company,<br><br>                              Plaintiff,<br><br>      v.<br><br>EXPEDIA, INC.,<br><br>                              Defendant. | No.<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

COMPLAINT - i

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................... 1

II.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE ................................. 2

III.   PARTIES .................................................................................. 3

    A.    Plaintiff ............................................................................ 3

    B.    Defendant ......................................................................... 3

IV.   FACTS ..................................................................................... 4

    A.    Online hotel booking market ................................................... 4

    B.    Trivago ............................................................................ 6

    C.    Expedia ........................................................................... 9

    D.    Amoma .......................................................................... 11

    E.    Trivago excludes Amoma for Expedia's benefit ............................. 13

        1.    Trivago launches bid modifiers ........................................ 13

        2.    Amoma attempts to adapt .............................................. 15

        3.    Amoma forced out ...................................................... 19

V.    STATUTE OF LIMITATIONS ............................................................ 21

VI.   CLAIMS FOR RELIEF .................................................................... 21

VII.  PRAYER FOR RELIEF ................................................................... 23

VIII. DEMAND FOR JURY TRIAL ............................................................ 23

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Plaintiff The Office Cantonal des Faillites de la République et du Canton de Genève, acting in its capacity as representative in the bankruptcy of AMOMA SARL, a limited liability company ("Amoma"), alleges the following upon personal knowledge as to itself and its own acts, and as to all other matters upon information and belief, the investigation made by and through its attorneys, and publicly available materials. It brings this action against Expedia, Inc. ("Expedia").

## I.  INTRODUCTION

1.      Consumers booking a hotel online seem to have many options. They can book through the hotel website. Or they can go looking for a better deal on various hotel booking platforms, such as Hotels.com, Travelocity, Hotwire, Expedia.com, and Orbitz.

2.      Those platforms are ultimately owned by the same company: Expedia. Unlike other hotel booking companies, Expedia also owns a hotel "metasearch" platform, Trivago, which collects and highlights the deals offered by those booking platforms.

3.      Amoma once stood out as one of the few hotel booking platforms not owned by Expedia, or its other major competitor, Booking Holdings (owner of Booking.com, Priceline, Agoda, Kayak, and HotelsCombined). Amoma was not bound by their same agreements with large hotel chains. It could thus often offer consumers lower rates than the other hotel booking platforms.

4.      This case concerns Expedia's efforts to use its subsidiary, Trivago, to box out one of its competitors in the hotel-booking market.

5.      Through its control of Trivago, Expedia controls its competitors' ability to advertise rates to their customers.

6.      Between 2014 and 2019, Trivago expressed interest in partnering with and even possibly acquiring Amoma. Trivago became Amoma's main source of bookings.

7.      But then Trivago switched course. Over the late summer and early fall of 2019, Trivago made rapid changes to its systems that made it increasingly difficult for Amoma to list competitive offers on Trivago.

8.      These changes occurred just after Trivago met with its largest advertisers: its parent

COMPLAINT - 1

company Expedia (and its brands) and Booking (and its brands). Even though it was the third largest advertiser on the Trivago platform, Amoma was not invited to this meeting.

9.    Despite desperate attempts to right the ship, in September 2019, the haphazard changes forced Amoma to declare bankruptcy.

10.    Trivago's changes ultimately hurt its own fortunes, but there was one clear winner: its parent company, Expedia, whose booking platforms no longer had to compete with Amoma's low rates in the online hotel booking market.

11.    Expedia's attempted abuse of monopoly power in the online hotel-booking-platform market violates federal antitrust laws as well as the Washington Consumer Protection Act. Were it not for Defendant's actions, consumers would have access to lower hotel rates, and Amoma would still be in business.

## II.  JURISDICTION, VENUE, AND INTERSTATE COMMERCE

12.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. section 1331 because Amoma brings a federal antitrust claim. This Court has supplemental jurisdiction over Plaintiff's pendent state-law claim pursuant to 28 U.S.C. section 1367.

13.    This Court also has jurisdiction over this lawsuit under 28 U.S.C. section 1332 because Amoma and Expedia are citizens of different states and the amount in controversy exceeds $75,000.

14.    The Court has personal jurisdiction over Expedia because it is headquartered in the Western District of Washington.

15.    Venue is proper under 28 U.S.C. sections 1391(b)(1) and (2) because a substantial part of the events or omissions giving rise to the claims occurred in the Western District of Washington, where Expedia is headquartered and exercises its control over Trivago.

16.    Expedia advertises its products to consumers in all fifty states. Its advertisement and distribution of its products involves a continuous and uninterrupted flow of commerce across state lines. Defendant's business practices and anticompetitive actions have had (and continue to

COMPLAINT - 2

have) a substantial effect on interstate trade and commerce in the online travel marketplace.

## III. PARTIES

**A.     Plaintiff**

17.     Amoma is a limited liability company under Swiss Law whose registered office is in Geneva, Switzerland. It is represented in this action by its legal representative, a company in bankruptcy following a ruling by the Court of First Instance of the Canton of Geneva on October 28, 2019. The company still legally exists under a liquidation status. Amoma was incorporated under Swiss laws and headquartered in Geneva.

**B.     Defendant**

18.     Expedia, Inc., is a Washington corporation with a principal place of business at 1111 Expedia Group Way W, Seattle, Washington, 98119. Expedia owns various online hotel booking companies, including Expedia.com, Hotels.com, Orbitz.com, Travelocity.com, Hotwire.com, and Cheaptickets.com.

19.     Expedia also owns trivago N.V., a limited liability company based in Dusseldorf, Germany, and incorporated in the Netherlands. Since 2013, it has been majority-owned by Expedia. It carries on business in the United States through its online search and price comparison platform for travel accommodations. Trivago uses the website address trivago.com for United States consumers. In December 2016, Trivago completed an initial public offering on the Nasdaq Stock Exchange.

20.     Expedia's leadership served on Trivago's Supervisory Board in 2019. Mark Okerstrom, Chairman of the Board for Trivago in 2019, was, at the time, Expedia's Chief Executive Officer. He sat along with Robert J. Dzielak, Expedia's Chief Legal Officer and Secretary. Later, Eric M. Hart, Expedia's former Chief Financial Officer, and Ariane Gorin, who was then the President of Expedia Partner Solutions, were added to Trivago's board.

21.     Trivago's corporate governance structure allowed Expedia to exercise total control of Trivago's business strategy through the appointment of a majority of the members of Trivago's

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Supervisory Board.

## IV. FACTS

**A.    Online hotel booking market**

22.    Before the internet existed, travelers planning a vacation or a trip would consult with a travel agent or travel guides, telephone hotels, or walk into a hotel from the road and hope to book an empty room. Today, most leisure travelers book their hotels online.

23.    A popular way to find hotels online is through hotel search engines such as Google Hotel Ads, TripAdvisor, Kayak, and Trivago. These sites are also known as metasearch engines, price comparison websites, or hotel price aggregators.

24.    Hotel search engines combine the rates offered by hotels and online travel agencies into one place, ostensibly to help the traveler find the lowest rate. They then redirect the traveler to the hotel or online travel agency's website to complete the booking.

25.    Hotel search engines compete with regular search engines (such as Google, Microsoft Bing, and Yahoo!); independent hotel chains offering direct bookings (such as Hilton, and Marriott); online travel agencies; and alternative accommodation providers (e.g., Airbnb and VRBO).

26.    Among online hotel travel agencies (or hotel booking platforms), the two largest players are Expedia and Booking Holdings (formerly known as Priceline). Online hotel travel agencies compete in the market for online hotel bookings. This is the market for customers searching for and booking hotels online.

27.    Online travel agencies work to exclude hotels from this market. (One assessment found that by 2017, nearly 70% of all online hotel bookings occurred through online travel agencies; the remaining 30% were made directly through the hotels.) Online travel agencies' substantially greater advertising spending means that their listings overshadow hotels in online search results.

28.    Additionally, their advertising online and in other media leads customers to believe

COMPLAINT - 4

that they will receive a better deal through the online travel agency than they would booking directly through the hotel. Bjorn Hanson, clinical professor with the NYU Preston Robert Tisch Center for Hospitality and Tourism, told a hotel industry writer that the barrage of online travel agency TV advertising, much of it focused on price, created "top-of mind and unaided recall" among consumers, and noted that it was therefore "very difficult to compete against that volume of online travel agency advertising."

29.     Online travel agencies also offer loyalty programs that allow a consumer to earn benefits while staying at hotels in different hotel brand families.

30.     The online travel agencies are reasonably interchangeable, regardless of the specific hotel or hotel locations that the customer hopes to book: they provide similar booking experiences to consumers, and they even often advertise the exact same rate. Consumers in the online hotel booking market are primarily attracted to the hotel booking platform that they perceive to be offering the best price: if one online travel agency advertises a higher price, consumers will book the hotel they desire instead with the lower priced travel agency.

31.     It is difficult to enter the online hotel booking platform market, because one must establish access to hotel rooms at competitive rates. Expedia and Booking collect their hotel offers primarily through agreements with major hotel providers (which themselves control a large portion of the hotel industry). Generally speaking, these booking platforms either purchase rooms at a discount rate and apply a markup or receive a commission from the hotel for directing customers to them.

COMPLAINT - 5

**B.      Trivago**

32.      Trivago is a hotel search engine. It wound founded in 2006; acquired by Expedia in 2013; and went public in 2016.

33.      Expedia owns most of the voting power in Trivago. Trivago's post-IPO statements acknowledge that Expedia's "voting control will limit the ability of other shareholders to influence corporate matters and, as a result, [Trivago] may take actions that shareholders other than Expedia do not view as beneficial. . . . Expedia's interests may conflict with our interests . . . and conflicts of interest between Expedia, the Founders and us could be resolved in a manner unfavorable to us and our shareholders."



34.      Trivago's annual reports reveal that Expedia held 64.7% of the voting power in 2017; 68.8% of the voting power in 2018; and 68.1% of the voting power in 2019. The reports

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

explain that Trivago, a Dutch company, has declined to follow the Dutch Corporate Governance Code's principles and best practices provisions for management boards, supervisory boards, shareholders and general meetings, and other standards. Instead, Trivago opted to have only four independent supervisory board members, and declined to have a selection and appointment committee for its boards, because it would not be "beneficial for our governance structure," as a NASDAQ-listed company. These decisions allowed Expedia to exercise total control of Trivago's business strategy.

35.     Trivago's main competitors are Kayak (owned by Booking Holdings), TripAdvisor (formerly owned by Expedia), and Google Hotel Ads.

36.     Consumers visiting the Trivago website are prompted to enter a city or region in a search bar and select their desired dates and room type (for example, single, double, family, or multiple rooms). When a consumer initiates a search, the Trivago website displays an initial set of search results for the city or region, stay dates, and room type that the consumer has selected.

37.     The search results list the relevant hotels (or hotel) along with the various prices offered by the hotel booking platforms.

38.     One offer receives prominent placing. Trivago has changed the way it has highlighted this top offer over the years. Other offers appear in smaller font, and still more offers appear at an "all deals" or "more deals" link. A large majority of clicks on offers on the Trivago website are for the top position offer.

39.     Trivago's television and online advertising imply that Trivago helps consumers find the best price for their ideal hotel.

40.     Trivago only displays offers from hotel booking sites that have agreed to pay a certain amount of money to Trivago when a consumer clicks on the link to their price. The amount paid by a booking site to Trivago when a consumer clicks on their offer is called the "cost per click."

41.     Hotel booking platforms on Trivago can vary the amount that they are willing to

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

pay for each click. They bid against each other to pay Trivago the most per click.

42.     This arrangement incentivizes Trivago to give the top offer position to offers where the associated hotel booking platform will pay the most money per click—rather than offer the actual best deal.

43.     As a result, the cost-per-click is a very significant factor in determining which offer is the top position; an Australian Court determined that more expensive offers received "Top Position" placement over alternative lower priced offers in 66.8% of listings.

44.     That court ordered Trivago to pay $44,700,000 AUD for violations of the Australian Consumer Law associated with Trivago's misleading representations about its "top offer" display. *See Australian Competition and Consumer Commission v Trivago N.V.* (2020) 142 ACSR 338; [2020] FCA 16. The court found that from December 2016 to September 2019, Trivago inappropriately implied that the most prominently displayed offer was the best offer for the consumer, because it was the cheapest or otherwise most favorable. In fact, Trivago took into account how much the hotel booking platform was going to pay Trivago if the customer clicked the offer. Although Trivago made some changes to the website during that time that made its display less misleading, the changes did not resolve all concerns.

45.     Trivago's conduct harmed consumers, who were misled into believing that when they clicked the top offer, they would receive the best rate.

46.     Trivago's conduct also forced the hotel booking companies that advertised on its site to compete to offer the highest cost-per-click, rather than competing to offer the lowest rate to the consumers.

47.     Trivago came under investigation for the same practices by the British Competition and Market Authority. The German Competition Authority investigated similar practices in the hotel industry.

48.     Trivago's total revenues for the 2017, 2018, and 2019 calendar years were approximately €1.035 billion, approximately €915 million, and approximately €839 million,

COMPLAINT - 8

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

respectively.

**C.      Expedia**

49.     Expedia operates several online travel agencies, or hotel booking platforms, that advertise on Trivago and other hotel search engines: Expedia.com, Hotels.com, Orbitz.com, Travelocity.com, Hotwire.com, and Cheaptickets.com.

50.     Through its subsidiaries and partnerships with hotels, Expedia exercises substantial market control over the global market for online hotel bookings (i.e., the market for consumers booking hotels through online travel agencies).

51.     Trivago plays a major role in maintaining Expedia's dominance, because as detailed below, Expedia has used Trivago as a tool to study and exert pressure on hotel booking platforms that offer lower rates, as described below.

52.     Expedia has willfully attempted to monopolize the market for the online hotel booking market through anticompetitive conduct, including advertising techniques that mislead consumers (as described above) and platform changes that exclude its competitors (as described below). There is a dangerous probability that Expedia will achieve monopoly power in the market for online hotel bookings, given its power over a major hotel metasearch provider (which allows it to control which prices customers see), agreements with major hotel chains (which allow it to set available rates), and ownership of its own competitors.

53.     Expedia is a huge player in the U.S. online travel agency market. In 2018, one industry analysis site projected it to capture a major share of gross bookings (which include airline and other travel bookings, in addition to hotel bookings):

COMPLAINT - 9

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1

2

3

4

5

6

7

8



9    54.    Through its various brands, Expedia was estimated to control nearly half of the

10   entire U.S. online hotel booking ecosystem in 2016 and 2017, and nearly two-thirds of the

11   bookings on online travel agencies in the United States. (The United States is the largest travel

12   market in the world.) In that time, Expedia was the top national TV advertisers for online travel.[1]

13   55.    If anything, these figures understate Expedia's ability to control the online hotel

14   booking market, because Expedia also controls the supply of hotel rates through its agreements

15   with hotels, as well as the ability of its competitors to reach customers on the Trivago platform.

16   56.    For the most part, Expedia's booking platforms (Expedia, Hotels.com, etc.) collect

17   their hotel room offers through direct agreements with hotels and hotel chains.

18   57.    These agreements often included most favored nations clauses. These clauses

19   provide that the published rates that the hotel offers to Expedia will be as favorable as any rate that

20   the hotel offers to any other booking platform competitor, as well as the rates published by the

21   hotel on their websites. These clauses are aimed at preventing the smaller companies from working

22   with the hotels to get cheaper rooms, especially because the hotel market is concentrated in twelve

23   large hotel chains. The agreements also prevent Expedia from listing hotel offers below a certain

24   rate.

25

26   _____

[1] Dennis Schaal, "Hotel and Online Travel Agency Direct Booking Winners and Losers in 5 Charts," Skift (July 10, 2017), https://skift.com/2017/07/10/hotel-and-online-travel-agency-direct-booking-winners-and-losers-in-5-charts/.

COMPLAINT - 10

58.     As a result, Expedia and its partner hotels work together to ensure that travelers cannot get better deals on hotels than they are offering. Expedia works with hotels to achieve "rate parity." If the quoted price on hotels' own websites is the same as the price shown by online booking platforms and other third-party channels, then there is rate parity. If the quoted price on hotels' own websites is higher or lower than the price shown by booking platforms and other third-party channels, then there is disparity.

59.     Parity helps ensure that Expedia will not be undercut by the hotel's direct bookings. Expedia can attract customers to its site, and its own loyalty programs, by offering the best available rate. When hotels do offer lower rates, Expedia can punish them by excluding them from their platforms or by downgrading the hotels' listings in their search results.

60.     Despite the hotels' efforts, disparity does arise. Sometimes, contracted booking platforms choose to undercut the hotel's price or have an unauthorized promotion in place which results in price discrepancies.

61.     Disparity also arises from hotels' relationship with wholesalers. Hotels sell inventory not only to booking platforms like Expedia but also to entities known as hotel wholesalers, or bed banks. Wholesalers work as a business-to-business middleman between hotels and travel sellers, such as tour operators, airlines, traditional travel agencies, or conventions. Hotels sell their inventory to wholesalers at a steep discount, often with the understanding that the travel seller will pass the hotel rooms (or some of the rooms) on to customers as part of a bundled package.

62.     Noncontracted booking platforms receive inventory from wholesalers with rates that are below the rates that Expedia and Booking could offer.

**D.     Amoma**

63.     Amoma stood out as one of the few booking platforms that did not belong to the Expedia or Booking conglomerates.

64.     Amoma started as Olotels.com in 2006. Over the years, the company grew to

COMPLAINT - 11

employ over 200 people by 2013, when it changed its name to Amoma. Amoma rapidly established itself as a key player in online hotel reservations, generating over €2.5 billion in sales between 2014 and 2019.

65.     Amoma acquired its hotel rooms from the wholesale inventory. Accordingly, it was often able to advertise rates that undercut those offered by the hotel and its partner online travel agencies such as Expedia.

66.     These lower rates benefited consumers. Amoma was referred to as the "arch-undercutter" and "Enemy #1 for out-of-parity prices."

67.     Amoma listed offers on several hotel search engines, including Trivago, Google, TripAdvisor, Hotelscombined, and Kayak. It performed best in the market for last-minute check-ins; consumers in that segment were most likely to actually complete a booking with Amoma when they clicked on an Amoma offer.

68.     In 2014, Amoma signed an agreement with Trivago to be featured in its search listings, in exchange for a cost-per-click. That same year, Expedia expressed interest in acquiring Amoma. Amoma's founders met with Expedia's CEO in San Francisco in February 2014 and in Los Angeles in November 2014. As part of the acquisition project, Amoma was valued at €120 million.

69.     Over time, Trivago grew to account for over half of Amoma's sale of hotel rooms; other metasearch engines individually accounted for no more than 20%. Amoma became dependent on Trivago's listings because of Trivago's advertising power and resulting consumer awareness. Amoma made certain changes to its business model and strategic operations to make its offers more appealing on the Trivago platform.

70.     The arrangement benefitted both parties: in 2017, Trivago invoiced Amoma for almost 71 million clicks, representing almost 10% of Trivago's market share worldwide and 14.2% in Europe. Still, Booking and Expedia accounted for the majority of Trivago's clicks.

71.     Trivago had a history of reaching out to Amoma for projects that, in the end,

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

benefited only Trivago and Expedia's brands.

72.     In 2017, Amoma entered into a Margin Bidding agreement with Trivago. The agreement required Amoma to share its confidential net price—the amount that it had purchased the hotel room at—with Trivago. The program was launched in the Canadian market for a short term, but the larger implementation was never realized.

73.     In early 2019, Trivago reached out to Amoma about another deal, where Amoma's deals would be branded as Trivago Deals. The project launched in April 2019, but Trivago terminated the project for technical reasons three weeks later. It asked Amoma to keep sending it Amoma's net prices so that it could investigate the issue.

**E.     Trivago excludes Amoma for Expedia's benefit**

**1.     Trivago launches bid modifiers**

74.     Sometime in the first quarter of 2019, Trivago held a summit with its largest advertisers, Booking's brands and Expedia's brands, to work on strategic programs. Specifically, Trivago "brough the teams together to align perspective and to drive join projects." But Trivago did not invite Amoma, even though Amoma was one of the top three advertisers on the platform.

75.     Previously, Booking had not preferred Trivago's method of ranking offers on its site. Booking had reduced its activity (i.e., cut its advertising spending) on Trivago.

76.     Expedia recognized that an online hotel search engine could "change its algorithms or results in a manner that [could] negatively affected the search engine ranking" of hotel booking platforms. And that's exactly what it tried to do with Trivago, to destroy Amoma.

77.     In April 2019, Trivago reached out to Amoma to inform it that it was likely going to fade out its prior model for ranking offers on its site. The real aim of this move was to eliminate Amoma from the market and attract Booking back to the site.

78.     In May 2019, Trivago said that to replace its prior ranking model, it would introduce "bid modifiers." A "bid" was the cost-per-click amount that a booking platform was willing to pay to have its offer listed on Trivago's search results.

COMPLAINT - 13

79.     Bid modifiers, Trivago said, would allow the booking platforms to increase or decrease their cost-per-click bids depending on certain aspects of the customer's search. Trivago said bid modifiers would afford more granularity and flexibility when it comes to traffic acquisition and optimize return on advertising.

80.     Trivago did not disclose that this new system would only further obscure the cheapest prices from consumers and drive Amoma from the market. But Trivago did admit that it developed modifiers in an effort to "strengthen[] our relationship with our major advertisers," i.e., Booking and Expedia companies, who depended on contracts with hotels for their rates.

81.     Trivago said it would begin with two modifiers: length of stay (the number of days the traveler intended to stay at a hotel) and the time to travel (the number of days that the traveler was looking for the hotel in advance of their trip). In its guide to bid modifiers, Trivago explained to its booking platforms that "[a]s a result of more specific targeting, it becomes possible for you to compete on different segments of traffic. Because bid modifiers increase marketplace dynamics, it also requires careful analyzation of your performance data in order to make effective bidding decisions. Although more effort may be necessary, you will be able to compete at a much higher level."

82.     Trivago gave Amoma conflicting information about when bid modifiers would actually launch. Amoma was told that Trivago would "make bid modifiers available to an exclusive group of advertisers which includes Amoma," and that the bid-modifier system would rollout on July 1 for the "1st Advertiser Group" and on July 22 for the "2nd Advertiser Group," in certain test markets, in an A/B test-like set up.

83.     Trivago said it would then slowly scale the impact of bid-modifiers on its system and expand to additional markets.

84.     However, on May 22, 2019, Trivago told Amoma that its start date for bid modifiers would actually be July 22.

85.     But on June 19, Trivago informed Amoma that the bid modification would actually

COMPLAINT - 14

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

launch on July 1, as Amoma had originally been told. Although Amoma had been told that it was part of the first group, Amoma learned that the bid modifiers had actually launched sometime in mid-June for some advertisers: "H.com, B.com, and Expedia." Trivago said the reason for including those companies in the first wave was "purely practical. With the 3 advertisers in question, we could quickly test the setup, make sure we remove all the technical hurdles before the start and the impact is easier to monitor as we cover a significant share of the traffic by targeting the big 3. The aim is definitely not to exclude you guys."

        **2.**      **Amoma attempts to adapt**

86.     Amoma warned Trivago of the complicated situation it faced as a result of this algorithm change. The bid-modification system required Amoma to change its auction response system drastically. Amoma contacted Trivago on June 6, 2019, to alert it of communication and performance concerns, and requested a meeting.

87.     Amoma again contacted Trivago on June 23 to note that the promised tracking features for bid modifiers had not yet appeared. Trivago had promised that Amoma would be able to know whether bid modifiers had played a role in any particular "click." Even though Trivago had previously acknowledged that the bid modification system would require "careful analyzation of your performance data," Trivago did not have the appropriate parameters ready for the launch.

88.     On July 3, Trivago responded to Amoma to acknowledge some of the issues: "We consider you to be one of our most important partners, so it's not a question of a lack of will, but of a lack of results."

89.     When bid-modifiers launched in particular markets, Amoma attempted to compete. Given its past conversion rates, it opted to participate with increased modifiers for last-minute bookings and decreased modifiers for longer check-in date breakouts.

90.     Although some issues were resolved, Amoma was left without a way to understand what role bid modifiers were playing in the performance of its offers. As of August 20, Trivago was unable to report to Amoma the data necessary for Amoma to accurately understand, price,

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    and, thus, compete in, the bid-modifier market.

2        91.    Trivago was applying bid modifiers randomly to 20% of the traffic. It was not doing

3    so in a way where Amoma could have split the inventory to measure the impact of the modifiers,

4    such as through an A/B test where Amoma could clearly see the difference between (A) clicks

5    where its modifiers had been applied and (B) clicks where its modifiers had not been applied.

6        92.    Trivago announced on August 1 that they would extend the transition period for bid

7    modifiers by two-weeks "as we are making improvements to our infrastructure." Certain markets,

8    including Amoma's largest markets, would continue to have bid modifiers applied 50% of the

9    time. Trivago said that it would scale those markets to 100%, and launch all remaining markets on

10   20%, on August 19.

11       93.    Amoma's performance in its top markets (Italy and France) remained stable and

12   increased in August until August 18. In Spain, it experienced a drop in its share of having the "top

13   offer" around August 7. Amoma could not necessarily attribute the drop to bid modification in that

14   market (vs. seasonality) because Trivago was still applying bid modifiers only 50% of the time,

15   and Amoma could not accurately tell where the click came from.

16       94.    Amoma worked around the clock to work up their bid modifiers in advance of the

17   August 18 transition.

18       95.    On August 18, Amoma noticed a big drop in the share of having the top offer

19   position on Trivago. This drop meant that consumers were far less likely to click on Amoma's

20   offers. It also realized that Trivago's reporting to Amoma was incorrect, and Amoma was unable

21   to rely on that data to understand what was happening. This issue was not fixed until September

22   5. Nevertheless, by August 18, Amoma understood that it was losing the top offer placement for

23   bookings made at the last minute and for bookings made over 41 days in advance. Amoma also

24   lost top offer position for customers searching for stays of longer than three days. The visitors to

25   Amoma's site fell by 50% in the first weekend following the implementation.

26

COMPLAINT - 16





96.     In addition, Amoma's cost per click increased, while the number of clicks steadily decreased.

97.     On August 25, Amoma updated its bid modifiers to see if it could get back to a more

sustainable trend the next week. It increased its modifiers on the last-minute check-ins and for longer lengths of stays.

98.     Amoma gained some of the share of the top offer position in the following days, but its cost-per-acquisition started to increase significantly; the cost of the click was increasing without adequate increases in booking volume in return. Once again, Trivago had an issue reporting data to Amoma, which made it difficult for Amoma to assess what was going on.

99.     Amoma reached out to Trivago about the decline, but on August 29, Trivago told Amoma not to worry about the drop: "we are leaving the peak season at the moment and traffic is decreasing on trivago in general, especially in the European and US market. In addition, Amoma is losing clickshare . . .  and I believe this is partly due to the further roll-out of bid modifiers. Please find the clickshare development for the main markets attached and also suggestions for bid modifier values."

100.     Trivago advised Amoma to let Trivago control Amoma's bid modifiers. Trivago confirmed on August 30 that it would "upload modifiers coming from our marketplace team from tomorrow on." Amoma analyzed these files and noted that Trivago's bid modifiers were decreasing modifiers for last minute check-ins (Amoma's most profitable business) and increasing modifiers for bids for consumers searching for hotels over 41 days in advance, with longer stays. Customers with those parameters were less likely to actually book with Amoma.

101.     While Amoma's share of the top offer positions increased, its cost per click went up drastically, and the volume of sales did not improve enough to compensate—the cost per acquisition increased too much. Amoma took back control of its bid modifiers and again tried to make adjustments. Unfortunately, Amoma was still receiving incorrect data from Trivago. On September 9, Trivago confirmed to Amoma that its data was incorrect between August 30 and September 7.

102.     Meanwhile, Trivago was considering making a strategic investment into Amoma. The companies met on August 30 to discuss the deal. Trivago assured Amoma of its support, which

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

was to materialize in a rapid acquisition of a stake in Amoma by Trivago. Amoma's goal was to protect its customers with existing bookings, given its difficulties competing in the new bid-modification system.

103.    On September 8, Trivago announced that it would not make a capital offer in Amoma.

### 3.    Amoma forced out

104.    Amoma went bankrupt at the beginning of September 2019. Amoma's bankruptcy is exclusively linked to Expedia's plan to oust Amoma from the market through Trivago's rapid change of algorithm. Before the algorithm change, Amoma had invested substantial time and effort towards making its offers competitive on the Trivago website. Indeed, Amoma had previously shifted its systems and practices in response to prior changes in Trivago's advertising platform.

105.    Amoma could not rapidly shift all of its Trivago business to another hotel search engine in time to save its business; because Amoma was so invested in the Trivago platform, it could not count on the sales from the other hotel search engines to keep it alive.

106.    The bid modification system reflected a desire to oust Amoma from the market so that Expedia would not have to compete with Amoma's lower rates.

107.    Amoma's bankruptcy was declared by judgment dated October 28, 2019, which was subsequently the subject of an exequatur judgment dated March 8, 2022. But for Expedia's conduct, Amoma would have continued to advertise its prices on Trivago, and consumers around the world would have had access to Amoma's often lower hotel rates. The harm to Amoma amounts to the loss of its entire company, which was valued at over $100 million.

108.    Trivago has acknowledged the difficulties brought about by its bid modification system. In November 2019, its incoming CEO acknowledged: "The change has caused hiccups, and Trivago won't make any more tweaks this year to allow advertisers time to digest what's happened. . . . What's interesting to see that it took some advertisers - I mean it took advertisers significantly a different amount of time to train their algorithms to the new environment." Of

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

course, some advertisers had had more notice, and more time to learn the new environment, than others.

109.     Expedia cannot point to any legitimate business purpose for the bid-modification system, much less its rapid and haphazard implementation. The change did not benefit Trivago. Expedia acknowledged that "trivago saw volatility in their marketplace related to new advertiser features they introduced. That contributed to lower-than-expected revenue and a significant year-over-year decline in Q3 adjusted EBITDA." Expedia's lodging revenue, meanwhile, "increased 11% in the third quarter of 2019," "driven by growth at Expedia Partner Solutions, Hotels.com and Vrbo. . . Domestic room night growth accelerated in Core OTA, and we continue to gain share in the U.S."

110.     The change certainly did not benefit consumers. The bid-modification system prioritized hotel booking platforms that paid the most to Trivago—not the platforms that were offering the lowest price to the consumer. Thus, Expedia's anticompetitive conduct directly impacted the online hotel booking market: consumers no longer have access to lower hotel rates on metasearch engines and hotel booking websites that Amoma offered. Instead, a consumer will find the same hotel rate advertised for a particular hotel across all platforms. The reduced choices for consumers benefits Expedia, who can capture more of the market without lower-offer competitors.

111.     Segments of the hotel booking industry celebrated Amoma's exit. One hotel CEO said, "All in all, I think it's good news for those hoteliers not in control of their rate distribution, as it will help to improve their parity."

112.     In addition to forcing Amoma out, Expedia had been doing more behind the scenes to reinforce parity and its power in the online hotel booking market: in September 2019, Expedia announced that as part of a new agreement signed in April 2019, Expedia would become the exclusive global distributor of Marriott's wholesale rates, availability, and content to a network of global travel providers.

COMPLAINT - 20

# V.  STATUTE OF LIMITATIONS

113.    Expedia did not disclose its plan to force Amoma and other wholesale-rate competitors from the market. Defendant kept secret its internal meetings and conversations about the scheme, as well as its communications with other partners and Expedia subsidiaries.

114.    Expedia kept its behavior secret in order to advance its anticompetitive scheme and gain a greater share of online hotel bookings than they would have received in a more competitive market.

115.    Expedia, through its subsidiary Trivago, made statements to deceive Amoma and others into believing that its actions were not designed to achieve an anticompetitive effect.

116.    As a result of Defendant's fraudulent concealment of the real objective of its bid modifier scheme, it was not until September 2019, that Amoma understood that the bid modifier changes were intended to exclude Amoma from the online hotel travel agency market. Until Trivago provided accurate data, Amoma could not immediately understand, with accuracy, the effect of the bid-modifier change on its business. Amoma thus did not discover, and could not have discovered through the exercise of reasonable diligence, the anticompetitive nature of Expedia's scheme, until it was too late, in September 2019.

117.    Thus, all applicable statutes of limitations have been tolled.

118.    In addition, Defendant's meetings, communications, and nondisclosures constituted overt acts that began a new statute of limitations because those acts advanced the anticompetitive objectives of the scheme. These acts were new and independent acts that perpetuated the loyalty programs; they did not merely reaffirm Defendant's prior acts.

# VI. CLAIMS FOR RELIEF

## Claim 1. Violation of section 2 of the Sherman Act.

119.    Amoma incorporates the allegations above.

120.    Expedia violated Section 2 of the Sherman Act, 15 U.S.C. section 2. Expedia attempted to monopolize the global online hotel booking market by using its subsidiary to squeeze

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

its true competitor from the market.

121.    At all relevant times, Expedia had market power in the global market for online hotel travel agencies. Expedia owns a large number of online hotel travel agencies which in turn receive a large portion of all hotel bookings made through such agencies. It a high potential of achieving monopoly power in this market, particularly given its control over Trivago and agreements with hotels.

122.    Expedia has willfully acquired market power in its relevant market. It has intentionally acted through its subsidiary metasearch site to substantially lessen competition because they foreclose a substantial share of the relevant markets from competitor travel agencies that advertised lower rates.

123.    As a result of Expedia's intentional market power and anticompetitive actions, Amoma was forced out of the market for online hotel travel agencies, and consumers have fewer choices and experience less innovation in the relevant markets.

124.    Expedia's conduct can only be explained by anticompetitive motives. Any procompetitive purpose is false, or if incidentally achieved, could have been achieved through other means.

125.    Expedia's violations of section 2 of the Sherman Act directly and proximately damages Amoma's business and property in excess of $100 million. Amoma has suffered damages of the type the federal antitrust laws were designed to prevent, having been forced to declare bankruptcy and shut down business as a result of Expedia's actions.

126.    Under Federal Rule of Civil Procedure 57 and 28 U.S.C. section 2201(a), Amoma seeks a declaratory judgment that Expedia's actions, through its subsidiary Trivago, violate section 2 of the Sherman Act.

### **Claim 2. Violation of the Washington Consumer Protection Act**

127.    Amoma incorporates the allegations above.

128.    The Washington Consumer Protection Act prohibits "[u]nfair methods of

COMPLAINT - 22

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code. § 19.86.020.

129.    Defendant's acts were perpetrated in the course of trade or commerce within the meaning of Wash. Rev. Code § 19.86.010.

130.    Defendant's acts constituted unfair methods of competition and unfair acts. Expedia unfairly used its subsidiary, Trivago, to squeeze out a true competitor, Amoma, from the online hotel travel agency market.

131.    Expedia's violations directly and proximately damaged Amoma's business and property, in excess of $100 million. Because of Trivago's rapid changes to its system, Amoma was forced to declare bankruptcy and shut down its business.

132.    Defendant acted intentionally, or at least with knowledge of the consequences of its actions.

133.    Defendant is liable to Amoma for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well any other remedies the Court may deem appropriate under Wash. Rev. Code § 19.86.090.

## VII.    PRAYER FOR RELIEF

Amoma asks the Court for a judgment that:

1.    Declares that the alleged acts constitute attempted monopolization under the Sherman Act, section 2;

2.    Declares that the alleged acts violate the Washington Consumer Protection Act;

3.    Awards actual damages, attorney fees, costs, and other applicable relief available;

4.    Awards pre-judgment and post-judgment interest on such monetary relief; and

5.    Awards all other relief to which Amoma may be entitled at law or in equity.

## VIII.    DEMAND FOR JURY TRIAL

Amoma demands a jury trial on all claims asserted in this Complaint.

COMPLAINT - 23

DATED this 30th day of June, 2023.

KELLER ROHRBACK L.L.P.

By /s/ Lynn Lincoln Sarko
    Lynn Lincoln Sarko, WSBA #16569
    Ryan P. McDevitt, WSBA #43305
    Adele A. Daniel, WSBA #53315
    1201 Third Avenue, Suite 3200
    Seattle, WA  98101
    Telephone:  (206) 623-1900
    E-mail:  lsarko@kellerrohrback.com;
             rmcdevitt@kellerrohrback.com
             adaniel@kellerrohrback.com

    Gary A. Gotto (pro hac vice forthcoming)
    3101 N Central Avenue, Suite 1400
    Phoenix, AZ  85012
    Telephone:  (602) 248-0088
    E-mail:  ggotto@kellerrohrback.com

**Attorneys for Plaintiff Amoma**

COMPLAINT - 24