The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| The OFFICE CANTONAL DES FAILLITES DE LA RÉPUBLIQUE ET DU CANTON DE GENÈVE, acting in its capacity as representative in the bankruptcy of AMOMA SARL, a Swiss limited liability company,<br>Plaintiff,<br><br>v.<br><br>EXPEDIA, INC.,<br>Defendant. | CASE NO. 23-cv-983-BJR<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS** |

## I.       INTRODUCTION

This matter comes before the Court on a Motion to Dismiss filed by Defendant Expedia, Inc. ("Expedia"), seeking dismissal of claims brought by Plaintiff, the Office Cantonal des Faillites de la République et du Canton de Genève ("Plaintiff"). Plaintiff, acting in its capacity as representative in the bankruptcy of Swiss limited liability company Amoma SARL ("Amoma"), has asserted claims under Section 2 of the Sherman Act, and the Washington Consumer Protection Act ("CPA"), 15 U.S.C. § 2 and RCW § 19.86.020, respectively, and opposes the motion. Having reviewed the parties' briefs filed in support of and opposition to the motion, the Court finds and rules as follows.

ORDER DENYING
MOTION TO DISMISS

- 1

## II.      BACKGROUND

Amoma, an online hotel booking company organized under Swiss law, declared

bankruptcy in September 2019. Plaintiff, Amoma's representative in that bankruptcy, claims that

Amoma was driven out of business by the actions of non-party trivago N.V., a Dutch limited

liability company that is majority-owned and, Plaintiff alleges, controlled by Defendant Expedia.

Compl., ¶ 19. Trivago[1] is an internet hotel booking "metasearch" engine (or "price comparison

website"), used by consumers to find and compare hotel rates offered by various online travel

agencies ("OTAs"). *Id.*, ¶ 23. In response to a consumer's search query at trivago.com (*e.g.*, for a

hotel in London for January 25-27), trivago aggregates and displays a number of options offered

by, among other OTAs, expedia.com, orbitz.com, and travelocity.com, all of which are owned by

Defendant Expedia; by booking.com, a competitor entity; and, before its bankruptcy, by Amoma.

*Id.*, ¶ 49.

Plaintiff alleges that trivago only displays offers (or "advertisements") from OTAs "that

have agreed to pay a certain amount of money to Trivago when a consumer clicks on the link to

their price." Compl., ¶ 40. That amount of money that OTAs pay trivago, known as a "cost-per-

click," is determined through a dynamic bidding system by which OTAs "can vary the amount

that they are willing to pay for each click," depending on how likely they believe it is that a click

will ultimately be converted to an actual booking. *Id.*, ¶ 41. Essentially, OTAs "bid against each

other" for the privilege of advertising on trivago.com the hotel rooms they have available,

directly to the customer seeking a room. *Id.*, ¶ 40. According to Plaintiff, in response to a

---

[1] The Court defers to Expedia's non-capitalized spelling of "trivago," except to the extent the rules of grammar call for capitalization, *e.g.*, at the beginning of a sentence; or when quoting directly from Plaintiff's pleadings.

ORDER DENYING
MOTION TO DISMISS

- 2

customer's query, "[o]ne offer receives prominent placing," and "[a] large majority of clicks on offers on the Trivago website are for the top position offer." *Id.*, ¶ 38. Plaintiff alleges that the cost-per-click auction system "incentivizes Trivago to give the top offer position to offers where the associated [OTA] will pay the most money per click—rather than offer the actual best deal." *Id.*, ¶ 42. Accordingly, Plaintiff alleges, determining how much to bid for a cost-per-click in order to win that top position is critical to an OTA's success in advertising on trivago.

According to Plaintiff, many of the OTAs that advertise rates on trivago, including those agencies owned by Expedia, advertise rooms pursuant to agreements with hotel chains that provide that the rates the hotel offers to the agency "will be as favorable as any rate that the hotel offers to any other booking platform competitor, as well as the rates published by the hotel on their websites," or so-called "parity rates." Compl., ¶¶ 57, 58. In contrast, Amoma (which Plaintiff claims "once stood out as one of the few hotel booking platforms not owned by Expedia, or its other major competitor, Booking Holdings") acquired its rooms through a different process relying on "wholesale inventory," and "was not bound by their same agreements with large hotel chains." *Id.*, ¶ 3. Plaintiff claims that Amoma was therefore often able to offer lower—or "non-parity"—rates that undercut the rates offered by the Expedia companies. *Id.*, ¶¶ 65, 66 ("Amoma was referred to as the 'arch-undercutter' and 'Enemy #1 for out-of-parity prices.'").

By 2019, Amoma was trivago's third largest advertiser (after Expedia and Booking) and was dependent upon trivago for the sale of half of its bookings. *Id.*, ¶¶ 8, 69. In April and May of that year, trivago advised Amoma that trivago planned to alter the way hotel booking agencies bid on the cost-per-click they would have to pay to have their rates advertised on trivago's

ORDER DENYING
MOTION TO DISMISS

website, by introducing "bid modifiers" into the bidding process. *Id.*, ¶¶ 77-79. The first two "modifiers" trivago would introduce were length of stay, and time until travel (*i.e.*, the amount of time between the search and when the hotel room was needed). The new bid modification system, trivago allegedly told Amoma, would afford hotel booking agencies "more granularity and flexibility" in deciding how to spend advertising dollars, allowing booking agencies to take into account certain aspects of a consumer's search—*e.g.* length of stay—in deciding how to price their bids to advertise their rooms on trivago. *Id.*, ¶ 79. The bid modifiers would also, however, require a hotel booking agency to analyze and understand more particularly how the modifiers affected the success rate of its advertising efforts. *Id.*, ¶ 81 ("Trivago explained to its booking platforms that '[a]s a result of more specific targeting, it becomes possible for you to compete on different segments of traffic. Because bid modifiers increase marketplace dynamics, it also requires careful analyzation of your performance data in order to make effective bidding decisions. Although more effort may be necessary, you will be able to compete at a much higher level.'").

Trivago initially told Amoma it would begin implementation of the new system for Amoma on July 1, 2019. On May 22, trivago told Amoma it would not do so until July 22, and on June 19, it told Amoma the launch would in fact be July 1. Compl., ¶¶ 82, 84. Meanwhile, Plaintiff alleges, other platforms, including those owned by Expedia (and, presumably, Booking) were phased into the system several weeks before Amoma. *Id.*, ¶ 85. Amoma's initial rollout began at 20% of the traffic and would scale up to 100% by mid-August. *Id.*, ¶¶ 91,92.

Plaintiff alleges that the bid modifiers "required Amoma to change its auction response system drastically." *Id.*, ¶ 86. It alleges that trivago was not providing the performance data

ORDER DENYING
MOTION TO DISMISS

needed to understand the impact of the bid modifiers on Amoma's advertising, requiring Amoma to bid on advertising without sufficient information necessary to understand the value (*i.e.*, the success rates) of that advertising. *Id.*, ¶ 90 ("As of August 20, Trivago was unable to report to Amoma the data necessary for Amoma to accurately understand, price, and, thus, compete in, the bid-modifier market."). Amoma claims that around the time the bid modifiers were scaled to 100%, in mid-to-late August, it noticed a "big drop" in its share of the top position in response to consumer searches. *Id.*, ¶ 95. As its advertising on trivago.com grew more expensive and less prominent, Amoma claims, its booking volume also declined precipitously. Amoma went bankrupt in early September 2019, and blames its failure on trivago's bid modification system and the manner in which it was implemented. It further claims that its "bankruptcy is exclusively linked to Expedia's plan to oust Amoma from the market through Trivago's rapid change of algorithm." *Id.*, ¶ 104.

## III.   DISCUSSION

### A.  Standard on a Motion to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. This standard asks for "more than a sheer possibility that a defendant acted unlawfully." *Id*. The determination is a context-specific task requiring the court "to draw on its

ORDER DENYING
MOTION TO DISMISS

judicial experience and common sense." *Id*. at 679.

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1988). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 U.S. at 570 ("[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim.").

## B.  Whether Statute of Limitations Has Run on Antitrust and CPA Claims

Expedia seeks dismissal of Plaintiff's claims on statute-of-limitations grounds, claiming that the four-year limitation on both the federal antitrust claim and the state CPA claim has run. *See* 15 U.S.C. § 15b; RCW 19.86.120. The Complaint was filed on June 30, 2023. Expedia argues that Amoma had notice of trivago's planned bid modification as early as April 2019, when "Trivago reached out to Amoma to inform it that it was likely to fade out its prior model for ranking offers on its site," and certainly by the time Amoma learned that those "bid modifiers had actually launched sometime in mid-June for some advertisers" other than Amoma. Mot. at 17 (citing Compl. ¶ 77); Compl., ¶ 85 ("[O]n June 19, Trivago informed Amoma that the bid modification would actually launch on July 1."). Although it is not clear from the Complaint the exact date the launch for Amoma in fact took place, Expedia does not dispute that it was after

ORDER DENYING
MOTION TO DISMISS

June 30, 2019. Compl., ¶ 85.

The parties agree that the statute of limitations begins to run when the defendant "commits an act that injures" the plaintiff. Pl.'s Opp. at 19 (citing Mot. at 16-17 (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971))). The Court finds that, as Plaintiff argues, Amoma was not injured when it was first *notified* that there would be changes to trivago's advertising system. It was injured when those changes were actually *implemented* on or after July 1, and further injured in July, August, and September of 2019, when they continued to be imposed in a manner that, Plaintiff alleges, made it impossible for Amoma to effectively compete for the top offer position on trivago's website. Only then did Plaintiff's claims begin to toll. Thus Plaintiff filed its Complaint within four years of Defendant allegedly "committing the acts" that Plaintiff claims caused its injury. Accordingly, Expedia's statute of limitations argument is without merit, and its request for dismissal on these grounds is denied.

**C.  Attempted Monopolization Claim Under Section 2 of Sherman Act**

A plaintiff seeking to establish a claim for attempted monopolization under Section 2 of the Sherman Act must plead that the defendant (1) engaged in predatory or anticompetitive conduct; (2) did so with specific intent; (3) had a dangerous probability of achieving monopoly power; and (4) caused the plaintiff an antitrust injury. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir.1995). Expedia argues that Plaintiff has failed to allege facts supporting any of these elements, each of which the Court reviews in turn.

**1.  Expedia's Anticompetitive Conduct**

Defendant argues that Plaintiff has failed to allege facts making out the required element that Defendant engaged in what courts have alternately called predatory, exclusionary, or

ORDER DENYING
MOTION TO DISMISS

anticompetitive conduct. Defendant challenges and thus the Court addresses separately two distinct aspects of this element: whether Defendant (as opposed to non-party trivago) engaged in such conduct, and whether that conduct may be characterized as predatory.

### a.   Expedia's Control of Trivago's Actions

Plaintiff seeks to hold Expedia liable for trivago's bid modifiers, which Plaintiff claims caused Amoma's bankruptcy, alleging that Expedia exercised control over trivago through its majority ownership of trivago, and through influence over trivago's supervisory board. In its motion to dismiss, Expedia argues that the Complaint fails to allege facts sufficient to make such control "plausible" under the *Iqbal/Twombly* pleading standard, and in its reply also argues that "even if Amoma had adequately alleged that Expedia directed trivago to adopt bid modifiers," Expedia would not—in the absence of alter ego liability, which the parties appear to agree has not been pled here—be liable for trivago's actions as a matter of law. Def.'s Rep. at 3.

The Court addresses the second argument first, and dismisses it out of hand. "When the parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act." *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1070 (D. Colo. 2004) (citing *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 777 (1984) (stating in dicta that "[a]ny anticompetitive activities of corporations and their wholly-owned subsidiaries meriting antitrust remedies may be policed adequately without resort to the intra-enterprise conspiracy doctrine.... The *enterprise* is fully

ORDER DENYING
MOTION TO DISMISS

subject to § 2 of the Sherman Act ....") (emphasis in *Nobody in Particular*).[2] If Expedia controlled trivago's decisionmaking regarding the actions that allegedly caused Amoma's injuries, Expedia could not avoid Sherman antitrust liability by hiding behind its subsidiary. *Id*. at 109 ("To conclude that a parent can direct and require anticompetitive conduct of its subsidiaries, like any principal directing the conduct of an agent, and then escape antitrust liability by hiding behind its separate incorporation is counterintuitive.").

Expedia cites authority for the proposition that "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures will not give rise to direct liability" of a parent corporation. Def.'s Rep. at 3 (citing *United States v. Bestfoods*, 524 U.S. 51, 9-7 (1998)). While mere "monitoring" and "supervision" of a subsidiary's conduct will not give rise to direct liability of a parent, however, that parent's direct control of its subsidiary's anticompetitive actions may. If a plaintiff sufficiently pleads and ultimately proves such independent conduct, the parent corporation may be liable for causing its subsidiary to take anticompetitive actions, in violation of Section 2. *See Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890, 897 (N.D. Cal. 2009) ("[A] parent corporation *may* be held liable for the acts of its subsidiary 'where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company.'") (quoting *Bestfoods*, 524 U.S. at 62–63).

---

[2] The Court acknowledges that trivago is not alleged to be a "wholly-owned" subsidiary of Expedia, which during the relevant period owned approximately 65-70% of trivago shares, but Expedia has not argued, and authority does not suggest, that the degree of ownership should be material to the question of control in this case. Compl., ¶ 34.

ORDER DENYING
MOTION TO DISMISS

- 9

The next question raised by Expedia's motion is whether Plaintiff has adequately alleged Expedia's direct involvement in trivago's alleged anticompetitive conduct sufficient to state such a claim. The Court concludes that it has, if barely. The Complaint here alleges that "[t]hrough its control of Trivago, Expedia controls its competitors' ability to advertise rates to their customers." Compl., ¶ 5. Slightly more specifically, the Complaint states that "Expedia recognized that an online hotel search engine could 'change its algorithms or results in a manner that [could] negatively affected the search engine ranking' of hotel booking platforms. And that's exactly what it tried to do with Trivago, to destroy Amoma." *Id.*, ¶ 76 (*sic*). The Complaint also alleges that it was "Expedia's plan to oust Amoma from the market through Trivago's rapid change of algorithm," and that "Expedia attempted to monopolize the global online hotel booking market by using its subsidiary to squeeze its true competitor from the market." *Id.*, ¶¶ 104, 120.

Plaintiff also offers some scant—but at the pleading stage, sufficient—allegations regarding how control over trivago's actions might have been effected: through Expedia's majority ownership and voting share of trivago and, as of 2019, the placement of at least two Expedia executives—its CEO and its Chief Legal Officer—on trivago's supervisory board. Compl., ¶¶ 20, 21.[3] The Complaint also refers to a "summit" meeting trivago held with its biggest advertisers, including Expedia's and Booking's OTAs, to which Amoma had not been invited (despite being, allegedly, trivago's third-biggest advertiser), that took place just before trivago announced

---

[3] There are conflicting allegations regarding how many supervisory board members may have been appointed by Expedia during the relevant time period. The Complaint alleges that "Trivago opted to have only four independent supervisory board members," which appears to make a majority of the supervisory board non-Expedia-appointed. However, Plaintiff also cites a trivago annual report, referenced in the Complaint, that Plaintiff claims indicates four of the members were appointed by Expedia. Pl.'s Opp. at 7-8. This discrete dispute may be easily enough resolved at a later stage, and the Court need not do so now.

ORDER DENYING
MOTION TO DISMISS

adoption of the bid modifiers, suggesting that Expedia used the meeting as an opportunity to direct trivago to change its bidding system. *Id.*, ¶¶ 8, 74. In addition, the Complaint offers facts that suggest that trivago initially suffered from adoption of the bid modifiers, while Expedia (and its OTA subsidiaries) benefited from them. Compl., ¶ 109 ("trivago saw volatility in their marketplace related to new advertiser features they introduced. That contributed to lower-than-expected revenue and a significant year-over-year decline in Q3 adjusted EBITDA" while "Expedia's lodging revenue . . . 'increased 11% in the third quarter of 2019,' 'driven by growth at Expedia Partner Solutions, Hotels.com and Vrbo. . . Domestic room night growth accelerated in Core OTA.").

These allegations are admittedly sparse, but they are more than mere "labels and conclusions" or a "formulaic recitation" of this element of an antitrust claim. *Twombly*, 550 U.S. at 555 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."). Particularly since at this stage specific evidence of the detailed mechanics of the alleged conduct is unlikely to be within Plaintiff's possession, the allegations here are sufficient to make it "plausible" that Expedia could have and did direct trivago to take the actions alleged in the Complaint.

### b. Predatory or Exclusionary Means

The Sherman Act proscribes the "predatory or exclusionary means of attempting to monopolize the relevant market." *Fed. Trade Comm'n v. Qualcomm Inc.,* 969 F.3d 974, 990 (9th Cir. 2020) (quoting *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991,

ORDER DENYING
MOTION TO DISMISS

1000 (9th Cir. 2010)). The law is directed "not against conduct which is competitive, even severely so, but [only] against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

Expedia argues that Plaintiff has failed to allege sufficient facts to support a plausible inference that the bid modifiers were "exclusionary" or "anticompetitive" in a way proscribed by the antitrust statute. It argues that "a design change, such as trivago's adoption of bid modifiers, that seeks to improve a product does not constitute an exclusionary restraint prohibited by the Sherman Act." Mot. at 8 (citing *Allied Orthopedic*, 592 F.3d at 998). According to Expedia, it was Amoma's failure to adapt to the new bidding process, rather than any exclusionary conduct on the part of trivago (let alone Expedia), that doomed Amoma. Expedia notes that even the Complaint acknowledges that the bid modifiers were adopted, at least in part, for the presumably legitimate purpose of attracting Booking, one of Expedia's other competitors, back to the site; and to increase trivago's advertising revenue. Compl., ¶¶ 77, 110 ("The bid-modification system prioritized hotel booking platforms that paid the most to Trivago.").

The Court agrees that if Plaintiff were relying exclusively on trivago's adoption of a new bidding system, which Defendant claims was a straightforward "design change," its allegations would fall short of stating an attempted monopolization claim. Plaintiff has claimed, however, that trivago rolled out the bid modifiers in a way that distinctly disadvantaged Amoma, and not its competitors (including Expedia's OTA subsidiaries). For example, Plaintiff alleges that "Trivago gave Amoma conflicting information about when bid modifiers would actually launch," ultimately making them available to Amoma weeks after doing so for other online hotel travel agencies, presumably giving the latter more time to adapt. Compl., ¶¶ 82, 85. Plaintiff also alleges that while

ORDER DENYING
MOTION TO DISMISS

"Trivago had promised that Amoma would be able to know whether bid modifiers had played a role in any particular 'click,' . . . Trivago did not have the appropriate parameters ready for the launch." *Id.*, ¶ 87. Thus, while the bid modifiers purportedly required a closer analysis of data concerning advertising success to allow Amoma to price its bids appropriately, Plaintiff claims that trivago was not providing Amoma that data, and that Amoma "was left without a way to understand what role bid modifiers were playing in the performance of its offers." Compl., ¶ 90 ("As of August 20, Trivago was unable to report to Amoma the data necessary for Amoma to accurately understand, price, and, thus, compete in, the bid-modifier market."); *see also id.*, ¶ 95 ("Trivago's reporting to Amoma was incorrect, and Amoma was unable to rely on that data to understand what was happening."). As late as September 2019, Plaintiff alleges, "Amoma was still receiving incorrect data from Trivago." *Id.*, ¶ 101.

At the same time, Plaintiff claims, Amoma could not simply pivot to using another advertising platform, even as it grew apparent that the bid modifiers were tanking Amoma's sales. Over the years, as noted, Amoma had grown to rely on trivago for over half of Amoma's sale of hotel rooms. Compl., ¶ 69. ("Amoma became dependent on Trivago's listings because of Trivago's advertising power and resulting consumer awareness. Amoma made certain changes to its business model and strategic operations to make its offers more appealing on the Trivago platform."); *see also id.*, ¶ 105 ("Amoma could not rapidly shift all of its Trivago business to another hotel search engine in time to save its business; because Amoma was so invested in the Trivago platform, it could not count on the sales from the other hotel search engines to keep it alive.").

It is these additional allegations concerning trivago's failure to provide Amoma with accurate data, which Plaintiff claims Amoma needed to successfully adapt to the new system, that

ORDER DENYING
MOTION TO DISMISS

- 13

salvage Plaintiff's claims at the pleading stage. While the bid modifiers, on their own, may have been intended to serve some legitimate purpose (*e.g.*, increasing advertisers' cost-per-click), Defendant offers no legitimate explanation for the allegedly haphazard (if not "inscrutable and deceitful," Pl.'s Opp. at 5) way in which they were imposed on Amoma. As the Ninth Circuit has noted, a "new and improved product design could constitute a violation of Section 2 where some associated conduct ... supplies the violation." *Allied Orthopedic,* 592 F.3d at 999 (citations omitted) ("If a monopolist's design change is an improvement, it is necessarily tolerated by the antitrust laws, *unless the monopolist abuses or leverages its monopoly power in some other way when introducing the product*.") (emphasis added, cleaned up). Even assuming the bid modifiers were an otherwise permissible design change, according to Plaintiff's allegations, the way in which they were imposed on Amoma served no apparent competitive purpose. On the contrary, trivago would presumably have had every incentive to help its customer, Amoma, adapt to the changes, given the reasonable assumption that the more bidders competing for a top spot, the higher the going price. Accordingly, the Complaint sufficiently sets forth the "associated conduct" necessary to support the "predatory or exclusionary means" element of Plaintiff's antitrust claim. *See Allied Orthopedic*, 592 F.3d at 998 (absence of "procompetitive justification," may subject design change to antitrust scrutiny).

  2. **Antitrust Injury**

   To state a claim under Section 2 of the Sherman Act, it is not sufficient for a plaintiff to allege harm only to itself; it must also allege an antitrust injury, or one "that is of the type the antitrust laws were intended to prevent." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir.2013) (citation omitted). An "antitrust injury occurs only when the claimed injury flows from acts

ORDER DENYING
MOTION TO DISMISS

harmful to consumers." *Rebel Oil,* 51 F.3d at 1445. Defendant challenges the sufficiency of the Complaint's allegations regarding this element, arguing that even if Plaintiff has alleged it suffered an injury, that injury was nevertheless not to consumers and thus not the sort of injury the Sherman Act was intended to prevent.

The Court disagrees. The Complaint sets forth facts sufficient to allege that Amoma once held a prominent position in the online hotel booking market as a "non-parity" rate provider in competition with parity OTAs such as expedia.com and hotels.com. Compl., ¶ 66. Plaintiff claims that Amoma obtained hotel rooms for sale by a different means—from wholesale inventory—that allowed it to offer rooms at rates lower than those set by parity agreements. *Id.*, ¶ 65. Assuming these allegations are true, eliminating a non-parity competitor would indeed amount to an injury to competition, as it would deprive consumers of Amoma's lower, non-parity options. Plaintiff explicitly alleges this injury: "Expedia's anticompetitive conduct directly impacted the online hotel booking market: consumers no longer have access to lower hotel rates on metasearch engines and hotel booking websites that Amoma offered. Instead, a consumer will find the same hotel rate advertised for a particular hotel across all platforms." Compl., ¶ 110. These allegations are sufficient to make out this element of an antitrust claim.

### 3. Specific Intent to Harm Competition

A plaintiff asserting a Section 2 claim must prove that the defendant acted with "specific intent to control prices or destroy competition." *Rebel Oil*, 51 F.3d at 1433. Defendant here argues that "the Complaint is wholly devoid of *any* factual allegations indicating that Expedia had specific intent to use the changes in the trivago bidding system to monopolize the alleged market for global online hotel bookings." Mot. at 13.

ORDER DENYING
MOTION TO DISMISS

- 15

The Ninth Circuit has explained, however, that specific intent "can be satisfied 'by inference drawn from proof of predatory or anticompetitive conduct which constitutes an unreasonable restraint of trade.'" *Wi-LAN Inc. v. LG Elecs., Inc.*, 382 F. Supp. 3d 1012, 1025 (S.D. Cal. 2019) (citing *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 845 (9th Cir. 1980); *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980) ("Specific intent to monopolize will normally be proved by inference from conduct.")). As discussed above, Plaintiff has adequately alleged Expedia's predatory or anticompetitive conduct. *See supra*, § III.C.1.b. If proven, such conduct could give rise to an inference of the requisite intent. Plaintiff has also explicitly alleged that Expedia "has intentionally acted through its subsidiary metasearch site to substantially lessen competition because they [*sic*] foreclose a substantial share of the relevant markets from competitor travel agencies that advertised lower rates." Compl., ¶ 122. Given the Ninth Circuit's lenient standard of proving specific intent by inference, the Court concludes that this element has been adequately pled.

Furthermore, as Plaintiff observes, in the initial stages of litigation any direct evidence of a defendant's specific intent to control prices or destroy competition, if it exists, will most likely be in the defendant's, and not the plaintiff's, possession. Pl's. Opp. at 11 (citing *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1035 (C.D. Cal. 2007) ("At the pleading stage, facts to support allegations of [defendant's] intent are likely in the possession of [defendant] and may be discovered by [plaintiff] at a later stage in the litigation.")). Dismissing a complaint at the pleading stage based on a lack of detailed allegations supporting specific intent would be inappropriate for this reason as well.

ORDER DENYING
MOTION TO DISMISS

- 16

1        4. **Dangerous Probability of Monopoly**

2        Finally, to state a Section 2 attempted monopolization claim, a plaintiff must allege facts

3    making it plausible that there is a "dangerous probability" of the defendant achieving monopoly

4    power, defined as "the ability to 'control prices' or 'exclude competition' in the relevant market."

5    *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,* 20 F.4th 466, 484 (9th Cir. 2021); *Rebel Oil Co.,*

6    51 F.3d at 1433. In the absence of direct evidence, the plaintiff must "(1) define the relevant

7    market, (2) show that the defendant owns a dominant share of that market, and (3) show that there

8    are significant barriers to entry and show that existing competitors lack the capacity to increase

9    their output in the short run." *Optronic,* 20 F.4th at 484. Defendant argues that Plaintiff has failed

10   to sufficiently allege either the "relevant market" that Plaintiff claims, or that Defendant has a

11   "dominant share" of that market.[4] The Court addresses each of Defendant's challenges in turn.

12       First, Plaintiff's Complaint defines the "relevant market" as "global online hotel booking,"

13   or "the market for consumers booking hotels through online travel agencies." Compl., ¶¶ 120, 50.

14   A market definition "must encompass the product at issue as well as all economic substitutes for

15   the product." *Hicks v. PGA Tour, Inc.,* 897 F.3d 1109, 1120 (9th Cir. 2018) (citing *Newcal Indus.,*

16   *Inc. v. Ikon Off. Sol.,* 513 F.3d 1038, 1045 (9th Cir. 2008)). Economic substitutes are characterized

17   by a "reasonable interchangeability of use" or sufficient "cross-elasticity of demand" with the

18   relevant product. *Id*. Defendant argues that Plaintiff's market definition is too narrow in its

---

20   [4] In a footnote—and only in a footnote—Defendant also challenges the sufficiency of Plaintiff's "barriers to entry" pleading. *See* Mot. at 16, n. 16. Footnotes are best used, sparingly, for citations and references, nonessential

21   clarifications, and entertaining digressions. They are "the wrong place for substantive arguments on the merits of a motion." *First Advantage Background Servs. Corp. v. Private Eyes, Inc.,* 569 F. Supp. 2d 929, 935 n.1 (N.D. Cal.

22   2008). The Court declines to consider the argument that Defendant apparently determined was not worth including in the body of its motion, particularly since Plaintiff reasonably failed to catch it. *See* Pl.'s Opp. at 12, n. 13 ("Expedia does not assert that the Complaint lacks sufficient allegations regarding barriers to entry.").

23   ORDER DENYING
24   MOTION TO DISMISS

25   - 17

limitation to "online travel agencies," and should be expanded to also include other means of booking hotel rooms, such as individual hotel websites. According to Defendant, the Complaint lacks allegations making it plausible that hotel websites and other hotel booking modalities are not interchangeable, from the consumer's perspective, with online travel agencies.

As Plaintiff points out, however, the Complaint does in fact contain allegations supporting the conclusion that online travel agency sites are not interchangeable with other methods of booking hotels. For example, the Complaint alleges that OTAs "offer loyalty programs that allow a consumer to earn benefits while staying at hotels in different hotel brand families," and "that their advertising online and in other media leads customers to believe that they will receive a better deal through the online travel agency than they would booking directly through the hotel." Compl., ¶¶ 29, 28. While interchangeability of products is a question of fact, *see Rebel Oil*, 51 F.3d at 1435, at the pleading stage Plaintiff has made allegations making it plausible, at least, that booking through OTAs is not interchangeable with other methods of booking hotel rooms for purposes of market definition. This is particularly so given that "there is no requirement that these [relevant market] elements of the antitrust claim be pled with specificity." *Newcal Indus.,* 513 F.3d at 1045 ("An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect.").

Second, Defendant argues that the Complaint lacks sufficient allegations concerning the size of Expedia's share of the relevant market. The Court heeds the Ninth Circuit's caution that a "dominant share" standard is not a "numbers game." *See Rebel Oil,* 51 F.3d at 1438. Instead, the factors to consider are whether "the defendant owns a dominant share of th[e] market," "there are significant barriers to entry," and "existing competitors lack the capacity to increase their output

ORDER DENYING
MOTION TO DISMISS

- 18

in the short run." *Id.*, 51 F.3d at 1438.

In support of Expedia's purported "dominant share," Plaintiff makes the following relevant allegations:

- Expedia operates several online travel agencies, or hotel booking platforms, that advertise on Trivago and other hotel search engines: Expedia.com, Hotels.com, Orbitz.com, Travelocity.com, Hotwire.com, and Cheaptickets.com. Compl., ¶ 49.

- Through its subsidiaries and partnerships with hotels, Expedia exercises substantial market control over the global market for online hotel bookings. *Id.*, ¶ 50.

- There is a dangerous probability that Expedia will achieve monopoly power in the market for online hotel bookings, given its power over a major hotel metasearch provider (which allows it to control which prices customers see), agreements with major hotel chains (which allow it to set available rates), and ownership of its own competitors. *Id.*, ¶ 52.

- Through its various brands, Expedia was estimated to control nearly half of the entire U.S. online hotel booking ecosystem in 2016 and 2017, and nearly two-thirds of the bookings on online travel agencies in the United States. (The United States is the largest travel market in the world.) *Id.*, ¶ 54.

- Expedia also controls the supply of hotel rates through its agreements with hotels, as well as the ability of its competitors to reach customers on the Trivago platform. *Id.*, ¶ 55.

- It is difficult to enter the online hotel booking platform market, because one must establish access to hotel rooms at competitive rates, *Id.*, ¶ 31.

Defendant challenges the sufficiency of these allegations, primarily because, it argues, while Plaintiff has defined the relevant market as "global," the allegations concern only Expedia's share of the U.S. travel market. The Court agrees that the allegations are sparse and require some degree of reasonable extrapolation. Again, however, they go beyond the mere "labels and conclusions" that doom insufficiently pled claims. Here, Plaintiff has both explicitly alleged that "Expedia exercises substantial market control over the global market for online hotel bookings,"

ORDER DENYING
MOTION TO DISMISS

and set out the relatively specific mechanics of Defendant's purported domination, including its ownership of a "major hotel metasearch provider" (*i.e.*, trivago) which Plaintiff alleges has engaged in predatory conduct; its parity agreements with major hotel chains, through which it purportedly controls room rates and excludes other smaller OTAs "from working with the hotels to get cheaper rooms," Compl., ¶57; and its ownership of multiple "competing" hotel booking platforms, all household name brands, including expedia.com, orbitz.com, and travelocity.com. Combined with Plaintiff's allegation that "[i]t is difficult to enter the online hotel booking platform market," and at least one purported reason therefor, the Court concludes these allegations are sufficient.

As with several other elements of an attempted monopolization claim discussed herein, "[d]ismissals for insufficient pleading of market power are rare pre-discovery and are generally reserved for complaints bereft of factual allegations or which contain market share or market power allegations that are purely conclusory." *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 340 (D. Vt. 2010); *see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 444 (4th Cir. 2011) ("dismissals at the pre-discovery, pleading stage remain relatively rare and are generally limited to" certain types of "glaring deficiencies," such as failing to allege a relevant market. . . . As a result, the proper market definition in this case can be determined only after a factual inquiry into the commercial realities faced by consumers.") (cleaned up). The allegations outlined in the Complaint sufficiently make out the market share element of Plaintiff's Section 2 claim.

### D.      Washington Consumer Protection Act Claim

Defendant argues that Plaintiff's CPA claim "should be dismissed for the same reasons as

ORDER DENYING
MOTION TO DISMISS

- 20

its claim under Section 2 of the Sherman Act," and offers no independent argument for why the CPA claim should fail. Mot. at. 16. Because, as discussed above, the Court finds that Plaintiff's Section 2 allegations are sufficient, the Court denies Defendant's request for dismissal of the CPA claim as well.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is DENIED.

DATED this 1st day of February, 2024.

Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER DENYING
MOTION TO DISMISS

- 21